IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

THE STATE OF ARIZONA,
*Appellee,*
*v.*
TRENT CHRISTOPHER BENSON,
*Appellant.*

No. CR-11-0344-AP
Filed July 31, 2013

Appeal from the Superior Court in Maricopa County
The Honorable Susan M. Brnovich, Judge
No. CR2008-130121-001
**AFFIRMED**

COUNSEL

Thomas C. Horne, Arizona Attorney General, Jeffrey A. Zick, Chief
Counsel, Criminal Appeals/Capital Litigation, Kent E. Cattani, Former
Chief Counsel, Criminal Appeals/Capital Litigation, Jeffrey A. Sparks
(argued), Assistant Attorney General, Phoenix, for State of Arizona

Thomas A. Gorman (argued), Attorney at Law, Sedona, for Trent
Christopher Benson

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF
JUSTICE BERCH, VICE CHIEF JUSTICE BALES, JUSTICE PELANDER,
and JUSTICE BRUTINEL joined.

JUSTICE TIMMER, opinion of the Court:

¶1      Trent Christopher Benson was sentenced to death and prison terms
after a jury found him guilty of two counts of first degree murder and
eight other felonies. We have jurisdiction over this automatic appeal
pursuant to Article 6, Section 5(3) of the Arizona Constitution and A.R.S. §
13-4031.[1]

---

[1]      We cite the current versions of statutes unless material changes
have been made since Benson committed his offenses.

**BACKGROUND[2]**

¶2    Benson committed his crimes against four women at different times over a three-year period.

*Alisa*

¶3    In November 2004, Benson agreed to pay Alisa to have sex, and she got into his car. By his own account, he "snapped" while Alisa was performing a sexual act. He beat her about her face and head, strangled her to death with a ligature, and severely sexually assaulted her while she was dead or unconscious. Benson then left Alisa's partially clad body in a Mesa alley.

*Yolanda*

¶4    In August 2007, Benson kidnapped and assaulted Yolanda with the help of an unidentified man. The men abducted Yolanda by approaching her from behind, pulling her into a nearby white car, and rendering her unconscious by placing a chemical-soaked cloth over her mouth and nose. When Yolanda regained consciousness, Benson was sexually assaulting her in a room as the other man watched. The two men then left, but Benson soon returned alone and again sexually assaulted Yolanda. After Benson left, she escaped. Yolanda identified Benson as her attacker in a subsequent photo lineup and at trial.

*Karen*

¶5    In October 2007, Benson took Karen to his house after she agreed to engage in sex for money. After becoming enraged, he hit Karen and strangled her with a ligature. He later told police he sexually assaulted Karen while she was unconscious. Benson dumped her body on a Mesa street and then ran over her body with his car.

*Melissa*

¶6    Benson confessed to police that he assaulted Melissa in November 2007. As Melissa walked across a lot, she was choked from behind with a cord. She saw a white car before she fell unconscious. While Melissa was

---

2    We view the facts in the light most favorable to sustaining the jury's verdict. *State v. Garcia*, 224 Ariz. 1, 7 ¶ 2 n.1, 226 P.3d 370, 376 n.1 (2010).

unconscious, Benson severely sexually assaulted and hit her. When Melissa regained consciousness, she was lying on the side of the road.

*Arrest and prosecution*

¶7     In spring 2008, a woman told Mesa police that an Asian man in a white car had repeatedly attempted to solicit her. She said the man frequented a local bar, and the police began watching him. After the man, later identified as Benson, dropped a cigarette butt, the police retrieved it and took a DNA sample, which revealed a profile that matched profiles developed from swabs taken from all four victims.

¶8     The Mesa police arrested Benson, who confessed to killing Alisa and Karen and to assaulting Melissa. He denied assaulting Yolanda, however, and explained the presence of his DNA on her body by stating he had solicited a "Hispanic chick" around that time who must have been Yolanda.

¶9     The State indicted Benson on two counts of first degree murder, four counts of kidnapping, and four counts of sexual assault. A jury found him guilty on all charges except the sexual assault count concerning Karen, on which it returned a verdict for attempted sexual assault.

¶10     During the aggravation phase, the jury found three aggravating circumstances for each murder. At the penalty phase, the jury determined that Benson should be sentenced to death for each murder. Consistent with those verdicts, the trial court imposed death sentences for the murders and consecutive sentences totaling 135.5 years' imprisonment on the non-capital counts.

## DISCUSSION

### I.  PRETRIAL ISSUES

#### A.     Motion to sever counts 4 and 5

¶11     Benson first argues that the trial court violated his rights to due process and a fair trial by denying his motions to sever counts 4 and 5, concerning the kidnapping and assault of Yolanda, from the counts related to the other victims. We review these rulings for an abuse of discretion. *State v. Hausner*, 230 Ariz. 60, 74 ¶ 43, 280 P.3d 604, 618 (2012).

¶12      The state can join charges having "the same or similar character," but the defendant is entitled to sever as a matter of right, "unless evidence of the other offense . . . would be admissible under applicable rules of evidence if the offenses were tried separately."  Ariz. R. Crim. P. 13.3(a)(1), 13.4(b).  The trial court ruled that Benson was not entitled to sever the charges because evidence relating to counts 4 and 5 and the remaining counts would be cross-admissible under Arizona Rule of Evidence ("Rule") 404(c).

¶13      Rule 404(c) permits "evidence of other crimes, wrongs, or acts" to be admitted at trial if it shows the defendant "had a character trait giving rise to an aberrant sexual propensity to commit the offense charged."  A trial court can admit other-act evidence if, among other things, its evidentiary value is not substantially outweighed by the dangers listed in Rule 403.  Rule 404(c)(1)(C)-(D); *State v. Aguilar*, 209 Ariz. 40, 49 ¶ 30, 97 P.3d 865, 874 (2004).  Benson argues the trial court erred by making this finding because the attack on Yolanda was dissimilar to and remote in time from the other crimes.  *See* Rule 404(c)(1)(C)(i)-(ii) (listing dissimilarity and remoteness as factors to consider).

¶14      The trial court did not abuse its discretion.  Although the attack on Yolanda differed in some ways from the attacks on the other victims (for example, it involved a second assailant and the use of a chemical to render her unconscious), the attacks did not have to precisely align for the evidence to be cross-admissible.  *See State v. Lehr (Lehr III)*, 227 Ariz. 140, 147 ¶ 21, 254 P.3d 379, 386 (2011) (holding that "[a]cts need not be perfectly similar in order for evidence of them to be admitted under Rule 404"); *see also* Rule 404 cmt. to 1997 amendment ("[T]he rule does not contemplate any bright line test of . . . similarity.").  Importantly, the attack on Yolanda bore several similarities to the attacks on the other victims.  Benson picked up all victims from the street, rendered them unconscious, placed his mouth on their breasts, and sexually assaulted them while they were unconscious.  These similarities provided a reasonable basis for the court to infer that Benson's aberrant sexual propensities in each attack were probative on the charges involving all victims.  *See* Rule 404 cmt. to 1997 amendment (noting Rule 404(c) permits the court "to admit evidence of remote or dissimilar other acts providing there is a 'reasonable' basis . . . to . . . permit[] an inference that defendant had an aberrant sexual propensity that makes it more probable that he or she committed the sexual offense charged").

¶15     Nor were the offenses so remote in time that evidence of each would not have been cross-admissible due to the danger of unfair prejudice. The attacks on Yolanda, Karen, and Melissa occurred within a three-month period. Although the attack on Alisa occurred two years and nine months before the attack on Yolanda, this time interval did not require the trial court to find that the probative value of the evidence of each attack was substantially outweighed by the danger of unfair prejudice. *Cf. State v. Arner*, 195 Ariz. 394, 395 ¶ 1, 988 P.2d 1120, 1121 (App. 1999) (holding trial court did not err by permitting evidence that defendant molested another child three years before the victim); Rule 404 cmt. to 1997 amendment (remoteness factor not subject to a "bright line test").

¶16     Benson also argues that the joinder unfairly prejudiced him because his admissions to the other three attacks effectively reduced the State's burden to secure convictions on counts 4 and 5, which were then used as aggravating circumstances in the murder counts. As a consequence, Benson asserts, the State's burden to prove that the death sentences were warranted was also reduced. We disagree. Permitting the jury to consider admissible evidence probative of the attack on Yolanda did not reduce the State's burden of proof.

¶17     The trial court did not abuse its discretion by denying Benson's motions to sever counts 4 and 5.

### B.     Denial of motion to suppress replicate DNA test results

¶18     The Mesa Police Sex Crimes Division took vaginal, anal, and breast swabs from Yolanda's body. An analyst detected sperm cells on the anal swab but could not establish a DNA profile. DNA taken from the breast swab, however, matched Benson's DNA profile. When the crime lab retested the anal swab several months later using newer technology, the analyst was able to match the profile taken from the swab to Benson's profile.

¶19     Benson moved to preclude evidence of the second test as inconsistent with the first test. He presented expert testimony that no scientifically validated explanation justified the different results and argued that the analysts' explanations were inadmissible under the *Frye/Logerquist* standard. *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923); *see also Logerquist v. McVey*, 196 Ariz. 470, 489 ¶ 56, 1 P.3d 113, 132 (2000) (retaining the *Frye* rule in Arizona). The court denied Benson's

motion without performing a *Frye/Logerquist* analysis. We review the court's ruling for an abuse of discretion. *State v. Snelling*, 225 Ariz. 182, 187 ¶ 18, 236 P.3d 409, 414 (2010).

**¶20** Arizona courts used the *Frye/Logerquist* standard to determine the admissibility of expert opinions that relied on "the application of novel scientific principles, formulae, or procedures developed by others." *Logerquist*, 196 Ariz. at 490 ¶ 62, 1 P.3d at 133.[3] The State's analysts, however, did not rely on "novel scientific theories or processes" in conducting the second analysis for the anal swabs. Their conclusions, therefore, were not subject to *Frye* but were governed instead by Rules 403, 702, and 703. *Id.* at 477-78 ¶ 23, 1 P.3d at 120-21. Whether the analysts offered viable explanations for the different results obtained in each test was properly for the jury to decide. *Id.* at 488 ¶ 52, 1 P.3d at 131.

### C. Denial of motion to produce partially matching profiles in DPS database

**¶21** Benson argues that the trial court violated his rights to due process and a fair trial by denying his motion to require the State to produce partially matching DNA profiles within the Department of Public Safety ("DPS") database. We review a trial court's discovery ruling for an abuse of discretion. *State v. Roque*, 213 Ariz. 193, 205 ¶ 21, 141 P.3d 368, 380 (2006).

**¶22** Arizona Rule of Criminal Procedure 15.1(g) provides that the court may order disclosure of information not otherwise addressed in the rule if the defendant shows a "substantial need" for the information and "the defendant is unable without undue hardship to obtain the substantial equivalent by other means." Ariz. R. Crim. P. 15.1(g). To support his motion, Benson submitted transcripts from an evidentiary hearing addressing an identical request in an unrelated case, *State v. DeLuca*, Maricopa County Superior Court No. CR-2001-005011. In *DeLuca*, experts for each side agreed that the "product rule" is the accepted model used to

---

[3] In 2010, the legislature enacted A.R.S. § 12-2203, which replaced the *Frye* standard for admitting expert testimony with the *Daubert* standard. 2010 Ariz. Sess. Laws, ch. 302 (2d Reg. Sess.). *See generally Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993). Before Benson's trial, however, our court of appeals declared the statute unconstitutional. *Lear v. Fields*, 226 Ariz. 226, 233 ¶ 22, 245 P.3d 911, 918 (App. 2011). After Benson's trial, this Court amended Rule 702 to correspond to Federal Rule of Evidence 702.

compute the probability and frequency of random DNA matches among a general population. *See State v. Davolt*, 207 Ariz. 191, 209-10 ¶ 68, 84 P.3d 456, 474-75 (2004) (recognizing the validity of the product rule); *cf. State v. Bible*, 175 Ariz. 549, 582-83, 858 P.2d 1152, 1185-86 (1993) (providing an example of product rule calculation). Defense expert Dr. Laurence Mueller testified he needed the partial-match information from the DPS offender database to test whether the product rule accurately predicts the number of matches. The State's expert, Dr. Ranajit Chakraborty, countered that it would be inappropriate to use information from the DPS offender database to challenge the accuracy of the product rule because the database profiles are not sufficiently random.

¶23 Benson first argues that the trial court erred by hinging its ruling on whether his discovery request was "overly burdensome" rather than focusing on whether the requested information was relevant and exculpatory. But the court did not focus solely on whether Benson's request would unduly burden DPS. Rather, the court denied the motion for several reasons, including the unsuitability of the database for Dr. Mueller's tests, the novelty of his model, and the availability of other information to inform his tests.

¶24 Benson next argues that the information was exculpatory, and the State therefore was required to disclose it under *Brady v. Maryland*, 373 U.S. 83 (1963). "Under *Brady*, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012). Evidence is "material" for purposes of *Brady* "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* (citation omitted).

¶25 Benson has failed to demonstrate that the requested discovery is exculpatory or material. Dr. Mueller was uncertain whether the results of his research would verify the validity of the product rule or dispute it. *Cf. State v. Youngblood*, 173 Ariz. 502, 506, 844 P.2d 1152, 1156 (1993) (finding no *Brady* violation when "one could only say that the unpreserved evidence could have been subjected to tests, the results of which *might* have been exculpatory or inculpatory"). And Dr. Chakraborty testified it would be inappropriate to challenge the validity of the product rule with the DPS database because it contains an unknown number and type of relatives, an unknown number of duplicate profiles, and no identifying information about the offender's ethnicity and race. Finally, even if Dr. Mueller successfully challenged the "astronomical" probability of random

matches produced by applying the product rule, Benson acknowledged to the court that the probability of a random match would remain extremely remote, making a different trial result improbable. The State did not violate *Brady*.

### D.    Use of restraints

¶26    Benson argues that the trial court violated his rights to due process and to be free from cruel and unusual punishment by overruling his objection to being restrained with a stun belt and leg brace during trial. We review a trial court's decision to permit restraint of a defendant during trial for an abuse of discretion. *Davolt*, 207 Ariz. at 211 ¶¶ 84-85, 84 P.3d at 476.

¶27    Before trial, a court security supervisor from the Maricopa County Sheriff's Office testified he had created a security risk assessment for Benson and, based on the violent nature of the charges, classified him a "close-custody inmate," which warranted the highest level of security in the jail. Consequently, the supervisor recommended that a stun belt and leg brace be placed under Benson's clothing and that two uniformed deputies stay in the courtroom. The trial court overruled Benson's objection to the security measures, reasoning that "[Benson's] admission of violent behavior and current charges raise a concern for safety . . . and escape." The court inspected both devices and found that "the use of the stun belt and leg restraint is reasonable, necessary and not visible to the jurors."

¶28    Benson argues that restraints were unnecessary because the evidence did not show he presented a security risk. He points to a lack of complaints about his behavior while in pre-trial custody and contends the court incorrectly acquiesced to jail policy rather than considering the circumstances unique to his case.

¶29    Although a defendant generally has the right to be free from restraints in the courtroom, the court may order their use if, in the court's discretion, the restraints are needed for courtroom security and safety. *State v. Cruz*, 218 Ariz. 149, 168 ¶¶ 118-19, 181 P.3d 196, 215 (2008). But the court "must have grounds for ordering restraints and should not simply defer to the prosecutor's request, a sheriff's department's policy, or security personnel's preference for the use of restraints." *Id.* ¶ 119; *cf. Deck v. Missouri*, 544 U.S. 622, 633 (2005) (holding a state may use visible restraints in the guilt or penalty phases only if a special need for them

exists).  The type of restraints used should be proportionate to the security risk presented.  *Cruz*, 218 Ariz. at 168 ¶ 119, 181 P.3d at 215.

**¶30**    Contrary to Benson's assertion, the trial court based its ruling on case-specific concerns rather than jail policy.  The court relied on the security supervisor's individualized security risk assessment of Benson, the potential for imposition of the death penalty, the layout of the particular courtroom and building, and Benson's admissions to police that he had strangled the victims with his hands after losing his temper.  The record supports those findings, and the court acted within its discretion by permitting the use of non-visible restraints to ensure Benson would not endanger others or try to escape.

**¶31**    Benson also urges us to follow *Gonzalez v. Pliler*, 341 F.3d 897, 901 (9th Cir. 2003), which held that a court must pursue less restrictive alternatives before permitting use of a concealed stun belt during trial. We have rejected this approach, ruling instead that "settled Arizona law . . . leaves determinations regarding courtroom security to the trial judge's discretion."  *Cruz*, 218 Ariz. at 168 ¶¶ 120-21, 181 P.3d at 215.  A court should conduct a hearing regarding the necessity of using a stun belt and should not permit its use if disproportionate to the risk presented; but the court is not required to first pursue less restrictive alternatives.  *Id*. ¶¶ 119, 122.

**¶32**    Finally, Benson contends that he was denied a fair trial by use of the restraints.  He relies on cases holding that visible restraints may be used before a jury only as a "last resort" due to their prejudicial effect.  *See Deck*, 544 U.S. at 635 (stating visible shackles warranted only in the "exceptional case"); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) ("[N]o person should be tried while shackled and gagged except as a last resort.").  Those cases are distinguishable, however, because the record reflects that the stun belt and leg brace were not visible to the jury.  The trial court acted within its discretion by permitting use of the restraints.

## II.    AGGRAVATION PHASE ISSUES

### A.    Gratuitous violence jury instruction

**¶33**    Benson argues that the trial court deprived him of his rights to due process and a fair trial and his right to be free from cruel and unusual punishment by instructing the jury that he engaged in gratuitous violence sufficient to demonstrate the "especially heinous or depraved" aggravating circumstance if he continued to inflict violence on a victim

"after [he] knew or should have known that the victim was dead." Because Benson failed to raise this issue to the trial court, we review only for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

¶34 Benson argues that the trial court erred by using the "should-have-known" language in the jury instruction because it effectively lessened the State's burden to prove that Benson actually knew his victims were dead when he continued to inflict violence upon them. But this Court has repeatedly held that the state proves gratuitous violence by showing that (1) the defendant inflicted "violence beyond that necessary to kill," and (2) "the defendant continued to inflict violence after he knew *or should have known* that a fatal action had occurred." *State v. Bocharski* (*Bocharski II*), 218 Ariz. 476, 494 ¶¶ 85, 87, 189 P.3d 403, 421 (2008) (emphasis modified from original); *see also State v. Wallace* (*Wallace IV*), 229 Ariz. 155, 158 ¶ 10, 272 P.3d 1046, 1049 (2012) (to same effect). Benson acknowledges these holdings but argues that this Court has not applied the objective standard in practice. We rejected this argument in *Wallace IV*, and do so again here. 229 Ariz. at 158 ¶ 10 n.5, 272 P.3d at 1049 n.5.

¶35 Benson briefly argues that use of the should-have-known standard fails to further the goal of adducing the defendant's mental state, which is the focus of the heinous or depraved aggravator. *See id.* at 158 ¶ 9, 272 P.3d at 1049. We have previously held, however, that "[a] showing that a defendant continued to inflict violence after he knew or should have known that a fatal action had occurred provides essential evidence of the defendant's intent to inflict gratuitous violence." *Bocharski II*, 218 Ariz. at 494 ¶ 87, 189 P.3d at 421. Benson offers no reason to revisit this holding.

¶36 Benson next contends that use of the should-have-known standard fails to genuinely narrow the class of persons eligible for the death penalty, as constitutionally required for capital sentencing schemes. *See Arave v. Creech*, 507 U.S. 463, 474 (1993). We have held that a trial court sufficiently narrows application of the "heinous or depraved" part of the (F)(6) aggravator by instructing the jury to consider five factors, including gratuitous violence, as set forth in *State v. Gretzler* (*Gretzler III*), 135 Ariz. 42, 51-52, 659 P.2d 1, 10-11 (1983). *See also State v. Barreras*, 181 Ariz. 516, 522, 892 P.2d 852, 858 (1995). Benson does not explain how the should-have-known standard conflicts with that holding or unconstitutionally enlarges the class of death-eligible defendants. Under this standard, a finding of gratuitous violence applies only to murders in which a defendant continues to commit violence after the death or impending

death of the victim is apparent; it will not apply in every murder.  *Cf. Arave*, 507 U.S. at 474 ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." (emphasis omitted)).

¶37  The trial court did not err in instructing the jury on gratuitous violence.

### B.    "Especially cruel" jury instruction

¶38  Benson next argues that the trial court's jury instruction on the "especially cruel" aggravator was unconstitutionally vague, both facially and as applied, because it failed to provide a means for determining whether the cruelty inflicted on the victims was "especially cruel" or merely the sort that accompanies all strangulations.  We review jury instructions de novo.  *State v. Tucker* (*Tucker II*), 215 Ariz. 298, 310 ¶ 27, 160 P.3d 177, 189 (2007).

¶39  This Court has held that the especially cruel aggravator — while facially vague — may be remedied with an instruction requiring the jury to find "the victim was conscious during the mental anguish or physical pain and also . . . the defendant knew or should have known that the victim would suffer."  *Id.* at 310 ¶ 28, 310-11 ¶ 31, 160 P.3d at 189-90.  The court gave that instruction here, and further narrowing was not required.

### C.    Prosecutor's closing argument

¶40  Benson argues that the trial court violated his rights to a fair trial, due process, and to be free from cruel and unusual punishment by overruling objections to the prosecutor's misrepresentation of the "especially cruel" prong of the § 13-751(F)(6) aggravating circumstance during closing argument.  We will reverse a conviction for prosecutorial misconduct only if (1) the prosecutor committed misconduct and (2) a reasonable likelihood exists that the prosecutor's misconduct could have affected the verdict.  *State v. Prince* (*Prince II*), 226 Ariz. 516, 537 ¶ 84, 250 P.3d 1145, 1166 (2011).

¶41  The "especially cruel" prong of the (F)(6) aggravator focuses on the victim's mental state.  *Tucker II*, 215 Ariz. at 321 ¶ 100, 160 P.3d at 200.  A murder is "especially cruel" if the victim suffered physical pain or mental anguish while conscious during any portion of the attack and the defendant knew or should have known of the suffering.  *State v. McCray*,

218 Ariz. 252, 259 ¶ 31, 183 P.3d 503, 510 (2008).  The trial court instructed the jury in accordance with these principles.

¶42    After Benson's counsel argued in closing that the victims must have suffered for "a relatively short period of time" for the jury to find especial cruelty, the prosecutor argued in rebuttal that the State was "not required to prove to you any length of time other than there was a period when she suffered physically and/or emotionally," that "[n]o time limit" existed, and "all you need to find" is that the women suffered.  Benson contends the prosecutor misstated the law because a finding of especial cruelty requires evidence that the victim suffered physical or mental pain for some length of time.

¶43    This Court has held that "[t]he length of time during which a victim contemplates her fate affects whether the victim's mental anguish is sufficient to bring a murder within that group of murders that is especially cruel."  *State v. Prince* (*Prince I*), 206 Ariz. 24, 26-27 ¶ 8, 75 P.3d 114, 116-17 (2003).  No particular period of time must pass to sustain a finding of cruelty.  *See State v. Soto-Fong*, 187 Ariz. 186, 204, 928 P.2d 610, 628 (1996).  But "where shots, stabbings, or blows are inflicted in quick succession, one of them leading rapidly to unconsciousness, a finding of cruelty, without any additional supporting evidence, is not appropriate."  *Id*. (emphasis omitted).

¶44    The prosecutor in this case did not misstate the law.  He accurately stated that although the State had to prove that the victims suffered, it was not required to prove they suffered for any set length of time.  Although the prosecutor's statement that the jury needed to find only that the victim suffered mental or physical pain, in isolation, could suggest that a murder can be especially cruel even if the victim is rendered unconscious quickly, the statement's context clarifies that the prosecutor was referring only to the lack of a particular temporal requirement.  Indeed, after making this statement, the prosecutor accurately read the court's instruction defining cruelty.  Taking his statement in context, the prosecutor communicated the correct standard:  there is no bright-line rule about the length of time required to establish a victim's suffering.  *See id*.; *cf. State v. Cropper* (*Cropper II*), 223 Ariz. 522, 526 ¶ 12, 527 ¶ 14, 225 P.3d 579, 583-84 (2010) (holding there was no misconduct when prosecutor argued that period of time required for suffering was a "subjective" standard "defined by 'what that means to [the jury]'").  Because the prosecutor did not misstate the law in his closing argument, the trial court did not err by overruling Benson's objection.

### D. Sufficiency of evidence to support (F)(6) aggravator

¶45 In special verdicts, the jury found that each murder was both especially cruel and committed in an especially heinous or depraved manner, thereby establishing the (F)(6) aggravating circumstance. Benson challenges the sufficiency of the evidence to support these findings. To decide whether the State met its burden of proving the (F)(6) aggravator beyond a reasonable doubt, we must determine whether substantial evidence supports either that Benson committed each murder in an especially cruel or an especially heinous or depraved manner, viewing the facts in the light most favorable to sustaining the jury's verdict. *State v. Gunches*, 225 Ariz. 22, 25 ¶¶ 14-15, 234 P.3d 590, 593 (2010).

### i. Alisa

¶46 Sufficient evidence supports the jury's finding that Benson murdered Alisa in an especially cruel manner. Dr. Alan Zhang, a pathologist who performed an autopsy on Alisa's body, identified three marks on her neck, which indicated that the ligature had to be adjusted during the strangulation, thereby increasing the time it took to strangle her. According to Dr. Zhang, that adjustment, together with an abrasion on Alisa's chin and other injuries, suggested Alisa had struggled during the strangulation and experienced pain and emotional trauma. *Compare State v. Stokley*, 182 Ariz. 505, 517, 898 P.2d 454, 466 (1995) (holding "repetitive gripping" of ligature and other indications of a struggle evidenced especial cruelty), *with Snelling*, 225 Ariz. at 189 ¶¶ 31-32, 236 P.3d at 416 (finding no mental anguish when no evidence of a struggle, and "only a single ligature mark"), *and State v. Jimenez*, 165 Ariz. 444, 454, 799 P.2d 785, 795 (1990) (finding no especial cruelty when victim strangled "quickly and by surprise and she rapidly lost consciousness").

¶47 In light of Dr. Zhang's testimony, the jury could have reasonably found that Alisa was conscious long enough to fight back, experience pain, and suffer mental anguish about her fate. *See State v. Morris*, 215 Ariz. 324, 341 ¶ 79, 160 P.3d 203, 220 (2007) (upholding especial cruelty when state offered evidence that victims suffered and struggled during strangulation); *State v. Sansing*, 206 Ariz. 232, 236 ¶ 10, 77 P.3d 30, 34 (2003) ("[D]efensive wounds, . . . pleas for help, and [the victim's] attempts to resist" establish "mental anguish as she contemplated her ultimate fate."). Because Benson witnessed the injuries and Alisa's

conscious struggles, he knew or should have known that she suffered physical pain and mental anguish.

**¶48** Sufficient evidence supports the jury's finding that Benson murdered Alisa in an especially cruel manner. Given this conclusion, we need not decide whether the evidence also suffices to support the jury's finding that Benson killed Alisa in an especially heinous or depraved manner.

### ii. Karen

**¶49** Sufficient evidence supports a finding that Benson murdered Karen in an especially heinous or depraved manner by inflicting gratuitous violence. As previously explained, gratuitous violence can be found if the defendant "use[d] violence beyond that necessary to kill," and "continued to inflict violence after he knew or should have known that a fatal action had occurred." *Bocharski II*, 218 Ariz. at 494 ¶¶ 85, 87, 189 P.3d at 421 (emphasis omitted). Benson does not dispute that he committed more violence than necessary to kill Karen. Rather, he argues that insufficient evidence exists that he knew or should have known that Karen was dead when he inflicted that violence. But the State only had to demonstrate that Benson knew or should have known that a fatal action had occurred when he continued to inflict violence – not that Karen had died. *See Wallace IV*, 229 Ariz. at 160 ¶ 21, 272 P.3d at 1051 ("[T]he inquiry is not whether the victim was dead before further injury was inflicted, but rather whether more injury was inflicted than necessary to kill.").

**¶50** Ample evidence supports the jury's finding that Benson inflicted gratuitous violence on Karen after he knew or should have known he had inflicted fatal action. According to Benson, after realizing that Karen was dead because her "body was getting cold," he dragged her to the backseat of his car, drove somewhere, stopped, pushed her out of the car, and then ran over her. He later admitted to police that he might have run over Karen but "didn't think anything else would hurt her."

**¶51** Because the (F)(6) aggravator is supported by a finding that Benson inflicted gratuitous violence on Karen, thereby murdering her in an especially heinous or depraved manner, we need not decide whether the evidence sufficiently supports the jury's finding that the murder was especially cruel.

### III.    PENALTY PHASE ISSUES

### A.    Parole eligibility

¶52    Benson argues that the trial court violated his rights to due process and to be free from cruel and unusual punishment by refusing to accept his pre-trial waiver of parole eligibility and to later instruct the jury that he would not be paroled if given a life sentence.  We review the trial court's refusal to inform the jury of Benson's willingness to waive parole eligibility for an abuse of discretion.  *State v. Dann* (*Dann II*), 220 Ariz. 351, 372-73 ¶ 122, 207 P.3d 604, 625-26 (2009).

¶53    At the time of Benson's trial, A.R.S. § 13-751(A) (2011) provided that a defendant convicted of first degree murder shall be sentenced to death, natural life, or life without possibility for release until the completion of twenty-five years' imprisonment if the victim was fifteen or more years of age.[4]  Benson moved to waive his right to a parole-eligible sentence and asked the court to instruct the jury that he would be ineligible for parole if given a life sentence.  The court denied the motion and instructed the jury that if it did not impose the death penalty, "the Judge will sentence [Benson] to either life imprisonment without the possibility of release from prison or life imprisonment with the possibility of release from prison after 25 years."

¶54    Benson contends that the trial court erred by denying his motion because § 13-751(A) creates a "right" to parole eligibility, which he can waive as long as his waiver is knowing, intelligent, and voluntary.  We have previously rejected this argument in *Dann II*, 220 Ariz. at 372-73 ¶¶ 122-24, 207 P.3d at 625-26, and do so again here.  Section 13-751(A) does not confer a "right" to parole eligibility on defendants.  Indeed, the statute's plain language leaves the eligibility decision squarely within the trial court's discretion.  Although the legislature could have authorized a defendant to waive parole eligibility, it did not do so.

¶55    Benson also argues that the trial court deprived him of his rights to "individualized consideration" and to present mitigating evidence that he did not pose a future danger if confined for life in prison.  He contends that the court's instruction on parole eligibility invited the jury to speculate whether he would be released eventually if given a life sentence, thereby undermining mitigation evidence that he posed no threat while confined.

---

[4]    In 2012, the legislature amended § 13-751 to eliminate a capital defendant's eligibility for a sentence of life imprisonment with the possibility of release.  2012 Ariz. Sess. Laws, ch. 207, § 2 (2d Reg. Sess.).

¶56    Benson mistakenly relies on *Simmons v. South Carolina*, 512 U.S. 154 (1994), which held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."  512 U.S. at 156.  As explained, Arizona law does not make Benson ineligible for parole.  A.R.S. § 13-751(A).  Consequently, the trial court did not err by refusing to instruct the jury in accordance with *Simmons*.  *See State v. Hardy*, 230 Ariz. 281, 293 ¶ 58, 283 P.3d 12, 24 (2012), *cert. denied*, 133 S. Ct. 935 (2013) ("*Simmons* instructions are not required when '[n]o state law . . . prohibit[s the defendant's] release on parole.'" (alterations in original)); *Cruz*, 218 Ariz. at 160 ¶ 42, 181 P.3d at 207 (holding defendant not entitled to *Simmons* instruction because "[n]o state law would have prohibited Cruz's release on parole after serving twenty-five years, had he been given a life sentence."); *see also State v. Hargrave*, 225 Ariz. 1, 14-15 ¶ 53, 234 P.3d 569, 582-83 (2010) (noting a *Simmons* instruction is not required even when a defendant is not likely to be released if given a life sentence).

¶57    The trial court correctly instructed the jury on the three potential sentences provided by A.R.S. § 13-751(A).

## B.    Evidence of potential for release

¶58    In a related argument, Benson contends that the trial court violated his rights to due process and to be free from cruel and unusual punishment by denying his motion to admit evidence of his potential for release if given a life sentence.  Specifically, he argues that the court should have admitted evidence that (1) no mechanism exists for an inmate sentenced to life to apply for parole, (2) Benson's release would be unlikely in light of the number of inmates actually paroled after serving twenty-five years of a life sentence, and (3) a presumption exists that Benson's sentences would run consecutively under A.R.S. § 13-711(A), which would ensure he would never be released.  He asserts that this evidence constituted relevant mitigation because it militated against any concern jurors might have had that he would pose a future threat to society outside prison.  We review an evidentiary ruling for an abuse of discretion.  *State v. Chappell*, 225 Ariz. 229, 238 ¶ 28, 236 P.3d 1176, 1185 (2010).

¶59    The trial court acted within its discretion in denying Benson's motion based on the inadmissibility of the proposed evidence concerning the mechanism for obtaining parole and past parole decisions.  *Cf. Lockett*

*v. Ohio*, 438 U.S. 586, 604 n.12 (1978) ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."). Essentially, Benson sought to introduce evidence of the current mechanism for obtaining parole and past actions by the Board of Executive Clemency as a means of predicting what might happen with him in twenty-five years. This Court rejected a similar attempt in *Cruz*, holding that "testimony on what the Board [of Executive Clemency] might do in a hypothetical future case would have been too speculative to assist the jury." 218 Ariz. at 160 ¶ 45, 181 P.3d at 207.

¶60 The court also properly refused to admit evidence that it would presumptively impose consecutive sentences pursuant to A.R.S. § 13-711(A). That statute provides that sentences will run consecutively unless otherwise specified by the court. We recently stated that § 13-711(A) "creates no presumption in favor of consecutive sentences." *State v. Cota*, 229 Ariz. 136, 151 ¶ 78, 272 P.3d 1027, 1042 (2012), *cert. denied*, 133 S. Ct. 107 (2012).

¶61 The trial court did not abuse its discretion by refusing to admit evidence of Benson's potential for release if given a life sentence.

### C.    Victim impact statements

¶62 Benson contends that the trial court violated his rights to due process and to be free from cruel and unusual punishment by denying his motion to limit or exclude victim impact evidence and permitting the jury to consider emotional victim impact statements from Karen's mother and daughter. We review a trial court's admission of victim impact evidence for an abuse of discretion. *State v. Garza*, 216 Ariz. 56, 69 ¶ 60, 163 P.3d 1006, 1019 (2007).

¶63 Benson first argues that A.R.S. § 13-752(R) and Arizona Rule of Criminal Procedure 19.1(d)(3), which permit victims to describe the murder victim and inform the jury of the impact of a murder, violate the Eighth and Fourteenth Amendments by "infusing irrelevant emotional sympathies." We have previously rejected this argument, and Benson offers nothing new to prompt reconsideration. *See State v. Rose*, 231 Ariz. 500, 510 ¶ 42, 297 P.3d 906, 916 (2013).

¶64 Benson also argues that the victims' statements were "emotionally charged," unduly prejudicial, and might have influenced the sentence. Victim impact evidence "is generally admissible at sentencing unless it is

'so unduly prejudicial that it renders the trial fundamentally unfair.'" *Rose*, 231 Ariz. at 510 ¶ 45, 297 P.3d at 916 (quoting *Dann II*, 220 Ariz. at 369 ¶ 98, 207 P.3d at 622). The statements here, although emotional, were not unduly prejudicial. Karen's mother described her daughter's life and her grief, specifically her feelings upon receiving a letter from Karen two days after the murder. Karen's daughter described her relationship with Karen and expressed her deep grief. Neither victim recommended a particular sentence, and the trial court instructed the jury that the victim statements could not be considered as an aggravating circumstance. The court did not abuse its discretion by permitting the victim impact evidence.

## IV.    ABUSE OF DISCRETION REVIEW

¶65    Because Benson committed the murders after August 1, 2002, we review the jury's imposition of the death sentences for an abuse of discretion. A.R.S. § 13-756(A). The jury did not abuse its discretion if reasonable evidence supports the finding of aggravating circumstances and imposition of the death penalty. *Cota*, 229 Ariz. at 154 ¶ 90, 272 P.3d at 1044. Evidence is sufficient to support the finding of an aggravating circumstance if reasonable persons could conclude it establishes the circumstance beyond a reasonable doubt. *See State v. Gallardo*, 225 Ariz. 560, 565 ¶ 15, 242 P.3d 159, 164 (2010). We must uphold a jury's decision that death is appropriate if any "reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency." *Id*. at 570 ¶ 52, 242 P.3d at 169.

### A.    Proper standard of review and
### constitutionality of A.R.S. § 13-756(A)

¶66    Benson argues that the above-articulated abuse-of-discretion standard is "more deferential" and yields a different result than the abuse-of-discretion standard outlined in a footnote in *State v. Chapple*, 135 Ariz. 281, 297 n.18, 660 P.2d 1208, 1224 n.18 (1983). We rejected this argument in *Cota*, 229 Ariz. at 153 ¶ 91, 272 P.3d at 1044 ("[T]he standard . . . is now mandated by § 13–756(A), which was enacted after *Chapple*.").

¶67    Benson also contends that the abuse-of-discretion standard under § 13-756(A) violates the Eighth and Fourteenth Amendments because it fails to provide for "meaningful independent review" as required by *Gregg v. Georgia*, 428 U.S. 153 (1976). We have repeatedly rejected this argument. *See Rose*, 231 Ariz. at 515 ¶ 71, 297 P.3d at 921; *Hausner*, 230 Ariz. at 80 ¶ 84, 280 P.3d at 624; *Cota*, 229 Ariz. at 153 ¶ 92, 272 P.3d at 1044.

## B.      Aggravating Circumstances

¶68     The jury unanimously found the following three aggravating circumstances for each murder beyond a reasonable doubt:  (1) Benson previously was convicted of another offense "for which under Arizona law a sentence of life imprisonment or death was imposable," A.R.S. § 13-751(F)(1); (2) he previously was convicted of another serious offense, § 13-751(F)(2); and (3) he committed the murders in an "especially heinous, cruel or depraved manner," § 13-751(F)(6).

¶69     Benson does not contest the jury's finding that the (F)(1) aggravator applies, and it is sufficiently supported by the evidence.  The (F)(1) aggravator was established for Karen's murder through Benson's conviction for Alisa's murder, and vice versa. *Lehr III*, 227 Ariz. at 155 ¶ 76, 254 P.3d at 394; *see also Tucker II*, 215 Ariz. at 320 ¶ 98, 160 P.3d at 199 ("As long as the prior conviction is entered before the sentencing hearing, the conviction may support the (F)(1) aggravator even if it is committed before, contemporaneous with, or after the capital homicide.").

¶70     Nor does Benson contest the jury's finding that the (F)(2) aggravator applies, and it is supported by the evidence.  Benson's convictions for kidnapping and sexual assault of Alisa, Yolanda, and Melissa, and the kidnapping and attempted sexual assault of Karen established this aggravating circumstance.

¶71     Finally, as previously explained, *see supra* ¶¶ 46-50, the (F)(6) aggravator is sufficiently supported by the evidence with respect to each murder.

## C.      Propriety of death sentences

¶72     Benson proffered one statutory mitigating circumstance:  A.R.S. § 13-751(G)(1), which requires the jury to consider whether "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." He also offered several non-statutory mitigating factors relating to his difficult early childhood, lack of a criminal record, and good relationships with family, friends, and the community.

¶73     Benson's mitigation evidence primarily concerns his difficult early childhood in South Korea, where he was found wandering on the streets

before being placed in an orphanage, and evidence of post-traumatic stress disorder. A reasonable juror, however, could have given little mitigating weight to such evidence, particularly as Benson did not show how his disorder related to his mental state when he committed the murders, and his own experts conceded he knew right from wrong. *Cf. State v. Boggs*, 218 Ariz. 325, 344 ¶¶ 94-95, 185 P.3d 111, 130 (2008) (affording, in context of independent review, little mitigating weight to mental illness as a mitigating factor when "no expert testified that [defendant] did not know right from wrong, and none could establish his mental state at the time of the crime").

¶74 The jury did not abuse its discretion in imposing the death penalty for each murder.

## D. Other Constitutional Claims

¶75 Benson lists twenty-seven other constitutional claims that he acknowledges this Court has previously rejected but he seeks to preserve for federal review. We decline to revisit these claims.

## CONCLUSION

¶76 We affirm Benson's convictions and sentences.