SCHWELB, Senior Judge:
Following protracted evidentiary hearings in the Juvenile Branch of the Superior Court’s Family Division, A.W. was adjudicated a delinquent on the basis of his alleged commission of assault with intent to rob (AWIR) and misdemeanor malicious destruction of property (MDP). The trial judge placed A.W. on juvenile probation for four months. On appeal, A.W. con *1095 tends, inter alia, that the judge erred in denying A.W.’s motion to suppress statements and identification evidence and in prohibiting the defense expert witness from expressing an opinion as to the reliability of the victim’s identification of A.W. as his assailant. A.W. also claims that the evidence was insufficient as a matter of law to prove his guilt beyond a reasonable doubt. Primarily in light of the victim’s own unequivocal testimony that the person shown in a photograph taken of A.W. less than three hours after the offense was not the person who attacked him, we agree with AW.’s final claim, and we reverse the judgment without reaching or deciding the other issues that he has raised.
I. THE EVIDENCE
In September 2011, the trial court initially heard testimony on A.W.’s motion to suppress. On September 28, the judge denied the motion. A.W.’s bench trial followed, and the evidence from the motions hearing was made a part of the trial record. The judge granted A.W.’s motion for judgment of acquittal on a charge of aggravated assault, but at the conclusion of the trial he found A.W. guilty of AWIR and MDP.
The evidentiary record in this case is quite extensive, but in this opinion we confine ourselves to a discussion of that part of the evidence that informs our decision with respect to the issue that we view as dispositive. Issues relating to other evidence have been the subject of extensive disagreement and argument between the parties, but we find it unnecessary to address them.
On December 27, 2010, at about 5:10 p.m., Roger Gorke was sitting on a Metro train, listening to music and sending text messages on his cell phone. At the Gallery Place station, four young black persons in their teens or early twenties boarded the train. They appeared to be together, and they attracted his attention because some of them were being “rather loud.” Two or more of the members of this group appeared either to be female or cross-dressing males. There is no doubt that the young people were on the train for several minutes and that Mr. Gorke had ample opportunity to, and did, observe them. In particular, he watched and made eye contact with a young member of the group who had short hair, who was not dressed in women’s clothing, and who had been seated opposite the exit doors of the train, facing him.
Just before the train arrived at Union Station, the group gathered near the exit. At this point, the young man who had been sitting opposite Mr. Gorke tried to grab Mr. Gorke’s cell phone. Mr. Gorke testified that he “hung on and we were — his momentum of pulling, trying to get the phone, was pulling me out of the train.” During the struggle, Mr. Gorke was struck on the head from the side by someone (not the would-be phone thief) whom Mr. Gorke apparently did not see, and Mr. Gorke ended up on the ground on the platform, bruised and bleeding. The assailant released the cell phone, which was damaged as a result of the fracas.
Officer Thaddeus Ferguson, III of the Metropolitan Police Department responded to Union Station, arriving at about 5:30 P.M. After interviewing Mr. Gorke, the officer broadcast a lookout for two black males, one of whom was described as a transgender male with a long curly wig, thigh high boots, jeans, and a dark jacket. Ferguson testified that, in his subsequent report, he identified A.W. in a Metro surveillance video of the scene shortly after the incident, District Exhibit 5, as a person with a wig and long boots. Nothing in the video suggests that this person, who was one of a group of passengers walking down the platform, had been involved in an al *1096 tercation with Mr. Gorke, who was on the ground.
Mr. Gorke was transported to Howard University Hospital. At the hospital, Mr. Gorke was interviewed by Detective Cohn Dorrity of the Metropolitan Police Department. After relating what had occurred on the train, Mr. Gorke provided the following description of the person who had been seated opposite to him, facing him and who had tried to take his phone: between seventeen and twenty-two years of age, approximately 5'9" in height, with close-cut hair and a tan coat. He described a second member of the group, who had been sitting parallel to him — not the would-be phone-snatcher — as being a transvestite or cross-dresser, six feet in height, with a muscular build, a curly wig or hair, wearing a purple coat, tight jeans, and boots.
Later that evening, Officer Ferguson, who had been canvassing the area, stopped four young people at the Gallery Place Metro Station who appeared to match Mr. Gorke’s description of the group. According to Ferguson, one of the four, who turned out to be A.W., spontaneously stated that “we didn’t do anything to that white man. He fell on his own. We didn’t do anything to that man at Union Station.” Ferguson stated that A.W. had a lace-front wig, and he was wearing a dark purple coat, jeans, and long boots, thus matching the description of the non-snatcher in the lookout. The officer detained two of the men, including A.W., until after a warrant check disclosed that they were not wanted by the police, at which point they were released. However, Officer Ferguson identified a photograph which was admitted as District’s Exhibit 8 as accurately representing A.W.’s appearance when he was stopped at Gallery Place, and the officer made an in-court identification of A.W. without defense objection. Officer Ferguson also testified that he had seen A.W. on a number of other occasions and that he was always dressed as a woman, with curly hair or a wig.
Based on the information available to him, Detective Dorrity prepared a photo array to display to Mr. Gorke. The photograph of A.W. included in the array was two years old, and it came from another detective’s investigation of activities of a gang which had allegedly committed similar crimes, and with which A.W. was suspected of being connected.[1] When the array was shown to Mr. Gorke ten days after the assault, he pointed to the photograph of A.W. and stated that “this man right here, I recognize him.” He said that he specifically recalled the “almond-shaped eyes” and that “this is the person that grabbed my phone.” At the trial, but before he was shown District’s Exhibit 8, Mr. Gorke identified A.W. in court as his assailant.
Detective Dorrity also conducted a videotaped interview with A.W., relevant parts of which were played at trial. In the video, which was admitted as District’s Exhibit 11, A.W. confirmed much of Mr. Gorke’s account. Although A.W.’s description of his location on the train, in relation to where Mr. Gorke was sitting, was conveyed in substantial part by hand gestures and is not entirely clear, he indicated that he and his nephew had been sitting across the aisle from Mr. Gorke, apparently facing in the same direction. When told by the Detective that Mr. Gorke claimed that *1097 the two of them made eye contact, A.W. did not deny that this was possible. He insisted, however, that he did not snatch the phone or strike Mr. Gorke. Rather, he stated that it was one of the other three boys that tried to take the phone, and a “fat” boy who struck Mr. Gorke on the head.
After the motion to suppress was denied,[2] Mr. Gorke was re-called to the witness stand. In response to questions from counsel for the District, he described his assailant again as “a young African-American, very short hair,” and he added that “I really remember the shape of his eyes.” Counsel then asked whether “you see that individual in court today,” and Mr. Gorke testified that he did, but that this person, who was seated at the defense table, was “dressed very much differently.” He stated that “the person, when I saw them [sic], was dressed with a very very short hair, and the hair is significantly different now.” On cross-examination, defense counsel asked Mr. Gorke to examine District’s Exhibit 8, the photograph of A.W. taken by Officer Ferguson a few hours after the assault. Counsel for the District objected on unstated grounds, but the objection was overruled, and Mr. Gorke testified that he had “never seen this picture before.” He stated that the photograph resembled not the assailant with short hair who had been sitting across from him on the train, but rather the “cross-dresser” who had been seated parallel to him, as Mr. Gorke remembered that individual; Mr. Gorke remarked, however, that “that was nine months ago that I saw that person.” The following exchange ensued:
Q. So this picture, as far as you remember with nine months behind you, accurately reflects the clothing and the gender impression that you had of that cross dresser?
A. Right.
Q. Correct?
A. Correct.
Q. Now did ...
A. But that’s not the person who took my phone.
Q. That is not the person who took your phone?
A. No, that’s correct.
(Emphasis added). Turning to a key basis on which he had made the in-court identification of A.W. — the almond-shaped eyes— Mr. Gorke reiterated that in the courtroom, as on the scene and in the photo array, “his eyes are very distinctive to me.”
On redirect examination by counsel for the District, Mr. Gorke elaborated on his testimony on cross-examination, as follows:
Q. Mr. Gorke, looking at Government’s Exhibit No. 8, tell me about the eyes in that picture.
A. This person’s eyes are very round and open.
*1098 Q. And how do they compare in your opinion in this picture to the eyes that you remember from the person who took the phone?
A. The person who took the phone, his eyes were much more closed, and more almond shaped, and more squinty, but not in a pejorative way.
(Emphasis added). In other words, according to Mr. Gorke, the sole eyewitness who testified against A.W., the photograph of A.W. taken two-and-one-half hours after the assault showed an individual whose appearance, in terms of hair and clothing, was dramatically different from that of his assailant and was not his assailant. The photograph, in terms of gender impression, looked more like the cross-dresser than the short-haired would-be snatcher. In addition, the person in Exhibit 8 did not have the telltale almond-shaped eyes which Mr. Gorke had emphasized in describing the person who tried to steal his phone.
II. THE TRIAL JUDGE’S DECISION
After granting A.W.’s motion for judgment of acquittal of the charge of aggravated assault and then summarizing the evidence in some detail, the trial judge adjudged A.W. to be guilty of AWIR and MDP. Noting Mr. Gorke’s selection of A.W.’s photograph from the array within ten days of the assault, which was corroborated by A.W.’s admission that he was on the scene, the judge found the complaining witness to be “very credible” and his identification of A.W. to be reliable. The judge noted Mr. Gorke’s repeated insistence that it was the person with almond-shaped eyes who tried to take his phone. The judge also emphasized the significant amount of time that Mr. Gorke had to observe A.W., pointing out that at the time of the observation, no crime had been attempted, so that the situation was not unduly stressful. The judge considered the “unconscious transference” and “illusory conjecture” theories advanced by the defense expert for the proposition that the mind has difficulty in taking things in where multiple persons are involved, see supra note 2, but he found them inapplicable because only one person tried to take Mr. Gorke’s phone.
The judge acknowledged that Mr. Gorke had described his assailant as having short hair, but that in a photograph taken approximately two and a half hours later, he was (apparently) wearing a wig.[3] The judge also recognized that there were other inconsistencies in the District’s case regarding Mr. Gorke’s descriptions of the person who attempted to snatch his phone. Nevertheless, the judge found Mr. Gorke’s identification of A.W. to be reliable. With respect to the change in appearance, the District took the position that A.W. had time to go home and change his clothing and that he had the motive to do so if he wished to confuse those who might be seeking the perpetrators of the Union Station incident. The judge found it “odd” that A.W. would leave the area where the assault took place and then come back with his appearance changed, but he concluded, without further elaboration, that “I don’t have to figure that part of it out.”
In announcing his decision, the judge did not focus upon, or specifically allude to, the fact that during his cross-examination, and again on redirect, Mr. Gorke testified, spontaneously and unequivocally, that the person shown in District’s Exhibit 8 — a *1099 photograph of A.W. taken only a few hours after the assault — was not his assailant. The judge also made no mention of Mr. Gorke’s testimony that the person in Exhibit 8 appeared to be dressed like the cross-dresser who had been seated parallel to him on the train, but not like the short-haired phone-snatcher, nor did the judge make a reference to the Metro videotape, District’s Exhibit 5. Finally, the judge did not appear to regard it as significant that the person in the photograph did not have a principal and unchangeable trait by which, according to Mr. Gorke, the assailant could allegedly be identified, namely, almond-shaped eyes.
III. ANALYSIS
“In evaluating [a] claim[ ] of evi-dentiary insufficiency in [a] juvenile delinquency appeal[], we view the record ‘in the light most favorable to the [District], giving full play to the trial judge, as the trier of fact, to determine the credibility of the witnesses, to weigh the evidence, and to draw reasonable inferences.’ ” In re As.H., 851 A.2d 456, 459 (D.C.2004) (last alteration in original) (quoting In re T.M., 577 A.2d 1149, 1151 (D.C.1990)). “Any factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous.” Stroman v. United States, 878 A.2d 1241, 1244 (D.C.2005) (quoting Hill v. United States, 664 A.2d 347, 853 n. 10 (D.C.1995)) (internal quotation marks omitted). The evidence may be sufficient to support an adjudication of guilt even when “the finding of guilt rests solely upon the positive identification testimony of a single witness.” Crawley v. United States, 320 A.2d 309, 311 (D.C.1974) (citing United States v. Telfaire, 152 U.S.App.D.C. 146, 149 n. 5, 469 F.2d 552, 555 n. 5 (1972)), “so long as a reasonable person could find the identification convincing beyond a reasonable doubt.” Benn v. United States (Benn II), 978 A.2d 1257, 1265-66 (D.C.2009) (quoting Peterson v. United States, 657 A.2d 756, 760 (D.C.1995)) (internal quotation marks omitted).
At the same time, we cannot meaningfully evaluate the sufficiency of the evidence in this case without considering the special legal context in which it arises as a result of extensive judicial experience and scholarly research on the issue. “The vagaries of eyewitness identification, and the potential for wrongful convictions or adjudications based upon such evidence, have long been recognized in the District of Columbia.” In re As.H., 851 A.2d at 459-60 (citations omitted). The sole identification of A.W., as we have noted, was provided by a person who was a complete stranger to him. As we recognized in Webster v. United States, 623 A.2d 1198, 1204 n. 15 (D.C.1993) (citations omitted), the positive identification of a person not previously known to the witness is “proverbially untrustworthy,” and has been described as “perhaps the most fearful testimony known to the law of evidence.” “These judicial pronouncements are supported by research studies that have concluded that eyewitness error is the leading cause of wrongful conviction in the United States.” Benn II, 978 A.2d at 1265-66 (footnote and internal quotation marks omitted).
We recently had occasion to reiterate that “[ajlthough, in general, reviewing [courts] accord considerable deference to credibility findings by a trier of fact who has had the opportunity to observe the witnesses and assess their demeanor, ‘there are certain times when a [reviewing court] must override such a determination by examining evidence in the record that detracts from the [trier of fact’s] finding.’ ” In re Bradley, 70 A.3d 1189, 1193-94 (D.C.2013) (per curiam) (last alteration in original) (quoting Eilers v. District of Colum *1100 bia Bureau of Motor Vehicles Servs., 583 A.2d 677, 685 (D.C.1990)); see also Crawley, 320 A.2d at 312 (describing the responsibility of the appellate court in reviewing eyewitness identifications); In re As.H., 851 A.2d at 460 n. 7 (same). Especially in light of Mr. Gorke’s unequivocal testimony that District’s Exhibit 8 is not a photograph of his assailant but instead resembles the cross-dresser who was one of the assailant’s companions, we are of the opinion that this court’s quoted observations in the authorities cited above are relevant here.
We now turn to the application of the foregoing principles to the record before us. Although counsel for A.W. suggests otherwise, the District’s case is not without its strengths. There is not the slightest evidence that Mr. Gorke was anything but an honest witness — indeed, the trial judge specifically found him to be credible — and it is undisputed that he had ample opportunity to observe his assailant for several minutes. Mr. Gorke was curious to determine if the person sitting across from him was male or female, which made him pay closer attention than he might otherwise have done. Mr. Gorke’s ability to select a two-year-old photograph of A.W. from the photo array, when A.W. was admittedly on the scene of the crime, and no other person in the array was present, tends to support Mr. Gorke’s powers of observation. All in all, although the District’s affirmative case had its inconsistencies, Mr. Gorke’s selection of AW.’s photograph from the photo array arguably constituted formidable evidence.
It is undisputed and, indeed, indisputable that A.W. was photographed by the police some two and one half hours after the attempted snatching. Until defense counsel showed him this photograph, District Exhibit 8, Mr. Gorke had never seen it before. When he did see it, and without the slightest hesitation, Mr. Gorke emphatically and spontaneously volunteered that “that’s not the person that took my phone.” He adhered unequivocally to this testimony when questioned on redirect examination by the attorney for the District. Moreover, the person in this photograph, according to Mr. Gorke, did not have the almond-shaped eyes which Mr. Gorke said he observed on the scene, in the photo array, and in the courtroom.
In addition, the individual photographed in District’s Exhibit 8 had long hair or a wig, not the short hair which Mr. Gorke attributed to his assailant. So, too, according to Officer Ferguson, did A.W. in the Metro surveillance video of the scene immediately after the assault. Although the interval of nine months had made it more difficult for him to recall details, Mr. Gorke agreed that Exhibit 8 “accurately reflects the clothing and the gender impression that [he] had of the cross-dresser.” The District speculates that A.W. went home to change his appearance in order to confuse the police in the event that they might be looking for him as a result of the attempted robbery.[4] Since, in his testimony about his report, Officer Ferguson disclosed that in the Metro surveillance video of the scene immediately after the attempted snatching, A.W. was already wearing what Ferguson believed to be a wig, the District’s suggested scenario is, at best, extremely unlikely. In any event, Mr. Gorke made it clear, both to the police and at the trial, that the cross-dresser was not his assailant. It is conceivable, of course, that when photographed, A.W. was wearing clothes and a wig that made him resemble the cross-dresser. Common sense surely suggests, *1101 however, that this is most improbable. “Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth.” Poulnot v. District of Columbia, 608 A.2d 134, 139 (D.C.1992).
The District has not provided us with any persuasive explanation of Mr. Gorke’s testimony regarding Exhibit 8,[5] and the trial judge does not appear to have attributed any appreciable significance to it. But “the ‘reasonable doubt’ standard of proof is a formidable one. It ‘requires the factfinder to reach a subjective state of near certitude of the guilt of the accused.’ ” In re As.H., 851 A.2d at 459 (quoting Rivas v. United States, 783 A.2d 125, 134 (D.C.2001) (en banc) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979))). In our view, the record simply does not, and cannot, support the requisite “near-certitude” where, as in this case, the sole witness against A.W. has sworn that a photograph of A.W. taken only hours after the offense does not show his assailant but somewhat resembles the cross-dresser who, according to the witness, did not commit the offense. Based on the totality of the evidence and the victim’s unequivocal testimony in open court, there is too great a risk that the identification of A.W. was mistaken to support a finding of guilt beyond a reasonable doubt.
IV. CONCLUSION
For the foregoing reasons, the judgment is reversed for insufficient evidence.

So ordered.

Dissenting opinion by Senior Judge KING at page 1101.

. Counsel for A.W. objected vigorously to the use of this photograph as a part of the array and to testimony regarding how it was obtained and selected. Because of our disposition of this appeal on other grounds, we do not address this issue. For purposes of this opinion, we assume, without deciding, that the photo array and the testimony relating to it were properly admitted.

. The defense case consisted primarily of the extensive testimony of its expert witness on eyewitness identification. A.W. relies, inter alia, on the expert’s discussion of "unconscious transference," a theory under which "the accuracy of an eyewitness identification may be undermined ... when a person seen in one context is confused with a person seen in another." State v. Guilbert, 306 Conn. 218, 49 A.3d 705, 723 & n. 19 (2012). In Heath v. United States, 26 A.3d 266, 274 (D.C.2011), a case that featured the same expert witness, we referred to unconscious transference as a "phenomenon (if it exists),” but we reached no conclusion regarding the validity of the theory. Except to note that what appears to have happened in this case might arguably be viewed as consistent with unconscious transference, we need not and do not resolve that issue. See generally Young v. Conway, 698 F.3d 69, 81-82 (2d Cir.2012); State v. Chapple, 135 Ariz. 281, 660 P.2d 1208, 1221 (1983), superseded by statute on other grounds as stated in State v. Benson, 232 Ariz. 452, 307 P.3d 19, 34 (2013).

. Detective Dorrity testified that when he arrested A.W. at his home on January 13, 2011, some seventeen days after the assault, A.W. was dressed as he appeared in the interrogation tape, with long hair. According to A.W., he offered to let the detective pull his hair to confirm that it was not a wig, but the Detective declined the offer. The District claims, however, that A.W. was adjusting a wig when Officer Ferguson stopped him, and the judge evidently believed that A.W. had a wig.

. In his videotaped statement to Detective Dorrity, A.W. commented, not unreasonably, that if he had committed the offense, it would have made no sense for him to return to the scene.

. The District describes its Exhibit 8 as "grainy,” a characteristic which is not obvious to us. But even if we assume, arguendo, that the District’s description is correct, this might perhaps raise or contribute to a reasonable doubt if A.W. had the burden of proving his innocence, but it does little or nothing to help the District to establish A.W.’s guilt beyond a reasonable doubt.