IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

In the Matter of the Estate of:

LOIS CATHERINE REYNOLDS, Deceased.

SYLVIA REYNOLDS, as Personal
Representative of the Estate of
Lois Catherine Reynolds, *Petitioner/Appellant*,

*v.*

ROBIN REYNOLDS, *Respondent/Appellee*.

No. 1 CA-CV 13-0274
FILED 04/24/2014

Appeal from the Superior Court in Maricopa County
No.  PB2011-000192
The Honorable Geoffrey H. Fish, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Fennemore Craig, PC, Phoenix
By Timothy J. Berg, Ray K. Harris, Jacob J. Cranston
*Counsel for Petitioner/Appellant*

Jaburg & Wilk, PC, Phoenix
By Lauren L. Garner, Maria Crimi Speth
*Counsel for Respondent/Appellee*

---

**OPINION**

Chief Judge Diane M. Johnsen authored the opinion of the Court, in which Acting Presiding Judge Patricia K. Norris and Judge Maurice Portley joined.

---

**J O H N S E N**, Judge:

**¶1**         Robin Reynolds wrote two online commentaries about her mother Lois, one describing her own reaction to her elderly mother's diminished quality of life, and the other, a fond Mother's Day remembrance after her mother had died.  Robin's sister, Sylvia, personal representative of their mother's estate, objected to Robin's writings and listed a claim against Robin for violation of Lois's right of publicity on her inventory of the assets of the estate.  After Robin protested, the superior court disallowed the claim, ruling the estate had "no Right of Publicity."

**¶2**         We hold that a right of publicity exists under Arizona law and that it may be enforced by one's estate after death.  We affirm the superior court's order, however, because we conclude that, as a matter of law, Robin's commentaries do not give rise to a claim for a violation of Lois's right of publicity.

**FACTS AND PROCEDURAL HISTORY**

**¶3**         Robin's article for an online magazine in August 2010 was titled "*I Want to Die Like a Dog: Poignant Insights on Aging Gracefully.*"  In it, Robin described her aging mother's daily challenges with independent living.  Robin wrote that although her mother claimed she did not want to burden her children, she had made no care plans for herself and as a result, called on Robin for help with all manner of problems.  Robin observed that "[r]egardless of the magnitude of [her mother's] mishaps, I am expected to respond promptly with little regard for how stressful these episodes" were for Robin and her family.  Robin concluded that she had resolved not to leave these "agonizing decisions" to her own child.  She closed by saying she wished to age gracefully and "die like [her] dog," "not expecting anything, but happy and grateful for every kindness" she received.

¶4        Lois passed away in January 2011.  In her will, she named as heirs her children – Robin, Sylvia and their brother, Doug.  In April 2011, Doug wrote to Robin saying he and Sylvia were "shocked, hurt and deeply angry" to discover Robin's online account about their mother.  He demanded Robin remove the commentary and promise to refrain from writing anything else about their family "either in non-fiction or 'fictional form.'"  Shortly thereafter, through counsel and as personal representative, Sylvia asked Robin to sign an agreement to refrain from making any "[p]ublication actually or reasonably perceived to be about or relating to Lois (including without limitation Lois's name, likeness and description . . .)."  Robin refused to sign the agreement, and on Mother's Day a few weeks later, posted a blog tribute to Lois that included a photograph of herself with her mother.

¶5        When Sylvia issued an inventory of the estate, it included an entry labeled "Estate claim against Robin Reynolds [] for Right of Publicity in the name of Lois Catherine Reynolds."  Robin filed a petition to compel closure of the estate, arguing it could not assert any purported right of publicity on behalf of Lois.  After briefing, the superior court ruled the estate had no claim against Robin.

¶6        The estate timely appealed.  This court has jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") section 12-2101(B) (2014).[1]

# DISCUSSION

## A.        The Right of Publicity: General Principles.

¶7        Violation of the right of publicity, also termed "appropriation," originally was one of the four varieties of invasion of privacy.  *See* Restatement (Second) of Torts §§ 652A, 652C (1977); William L. Prosser, *Privacy*, 48 Cal. L. Rev. 383, 389 (1960).[2]  Arizona long has

---

[1]        Absent material revision after the relevant date, we cite a statute's current version.

[2]        Whether a right of publicity exists in Arizona is a question of law that we review *de novo.  See Calisi v. Unified Financial Servs., LLC*, 232 Ariz. 103, 106, ¶ 13, 302 P.3d 628, 631 (App. 2013).  "Thus we are not constrained by the legal conclusions . . . of the [superior] court." *Enterprise Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144, 148, ¶ 11, 3 P.3d 1064, 1068 (App. 1999).

recognized a common-law right of privacy, *see Reed v. Real Detective Publ'g Co.*, 63 Ariz. 294, 305, 162 P.2d 133, 138 (1945), allowing claims based on each of the three other forms of invasion of privacy. *See id.* (publication of private facts); *Hart v. Seven Resorts Inc.*, 190 Ariz. 272, 279, 947 P.2d 846, 853 (App. 1997) (intrusion upon seclusion)*; Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 342, 783 P.2d 781, 788 (1989) (false light).

¶8        The "right of publicity" at issue here is defined by the Restatement (Third) of Unfair Competition ("Restatement Third") § 46 (1995) as the right to the "commercial value of a person's identity." Under this provision, "[o]ne who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability" for resulting damages. *Id.* As the Restatement Third explains:

> Like the right of privacy, the right of publicity protects an individual's interest in personal dignity and autonomy. With its emphasis on commercial interests, the right of publicity also secures for plaintiffs the commercial value of their fame and prevents the unjust enrichment of others seeking to appropriate that value for themselves. The right to prohibit unauthorized commercial exploitation of one's identity allows a person to prevent harmful or excessive commercial use that may dilute the value of the identity. Although proof of deception or confusion is not an element of liability under this Section, the right of publicity indirectly affords protection against false suggestions of endorsement or sponsorship.

*Id.* cmt. c.

¶9        One of the earliest cases acknowledging the right of publicity was *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977). The plaintiff was an entertainer with "a 'human cannonball' act in which he is shot from a cannon into a net some 200 feet away." *Id.* at 563. He sued a television station that recorded his 15-second act at a fair and broadcast it in its entirety without his consent. *Id.* at 564. Acknowledging the plaintiff's right under state law to the "professional property" of his act, the Supreme Court held the television station had no First Amendment right to appropriate the act by broadcasting it without his consent. *Id.* at 575-77. Key to the Court's decision was that the television station effectively had stolen the commercial value of the plaintiff's act:

> If under this standard respondent had merely reported that petitioner was performing at the fair and described or commented on his act, with or without showing his picture on television, we would have a very different case. But petitioner is not contending that his appearance at the fair and his performance could not be reported by the press as newsworthy items. His complaint is that respondent filmed his entire act and displayed that film on television for the public to see and enjoy.

*Id*. at 569.

¶**10**        Rooted in recognition of the commercial value of an individual's name or likeness, the right of publicity is in the nature of a property right. Restatement Third § 46 cmt. g. Accordingly, the tort of appropriation affords redress of commercial injuries, by contrast to personal injuries of the sort remedied by a claim for, e.g., invasion of privacy by intrusion or publication of private facts. *Id.* cmt. a; *see Haelan Labs. Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953) (distinguishing personal right of privacy, which might give rise to a claim for personal injuries for hurt feelings caused by publication of one's picture, from that person's "right in the publicity value of his photograph, i.e., the right to grant the exclusive privilege of publishing his picture"); *Uhlaender v. Henricksen*, 316 F. Supp. 1277, 1280 (D. Minn. 1970) (by contrast to the three other traditional forms of invasion of privacy, a claim for appropriation generally considered to involve a pecuniary loss, an interference with property).

¶**11**        The right of publicity "is most often invoked to protect the value associated with the identity of a celebrity." Restatement Third § 46 cmt. d. Indeed, appropriation claims typically arise out of the unauthorized use of a well-known person's name or likeness in connection with the advertising of goods or services. *See, e.g., Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th Cir. 1983); *Palmer v. Schonhorn Enters., Inc.*, 232 A.2d 458 (N.J. Super. Ct. Ch. Div. 1967); *State ex rel. Elvis Presley Int'l Mem'l Found. v. Crowell*, 733 S.W. 2d 89, 97 (Tenn. App. 1987). But "the identity of even an unknown person may possess commercial value." Restatement Third § 46, cmt. d ("evaluation of the relative fame of the plaintiff is more properly relevant to the determination of appropriate relief"). *See Cont'l Optical Co. v. Reed*, 86 N.E.2d 306, 310 (Ind. App. 1949) (claim brought by Army optician); *Canessa v. J.I. Kislak, Inc.*, 235 A.2d 62, 75 (N.J. Super. 1967) (family searching for home to rent).

¶12        In the absence of Arizona law to the contrary, we generally follow the Restatement. *Espinoza v. Schulenburg*, 212 Ariz. 215, 217, ¶ 9, 129 P.3d 937, 939 (2006). We see no reason to depart from the Restatement Third in this matter, and therefore hold that an individual has a right of publicity that protects his or her name and/or likeness from appropriation for commercial or trade purposes.

## B.   Violation of a Decedent's Right of Publicity.

¶13        Citing A.R.S. § 14-3110 (2014), Robin argues a claim for violation of an individual's right of publicity does not survive the individual's death. In relevant part, the statute states, "Every cause of action, except a cause of action for damages for breach of promise to marry, seduction, libel, slander, separate maintenance, alimony, loss of consortium or invasion of the right of privacy, shall survive the death of the person" entitled to relief. A.R.S. § 14-3110. Robin argues the statute bars the estate's claim for violation of the right of publicity because the tort originated as a variety of invasion of privacy.

¶14        To determine whether § 14-3110's reference to an action for "invasion of the right of privacy" encompasses a claim for violation of the right of publicity, we first look to the language of the statute itself. When the language of a statute is clear and unambiguous, we give effect to its plain language. *Bilke v. State*, 206 Ariz. 462, 464, ¶ 11, 80 P.3d 269, 271 (2003).

¶15        On its face, § 14-3110 does not refer to a claim for violation of the right of publicity. The omission is logical: The statute excepts from the general rule of survival only a handful of deeply personal claims, and, as we have stated, the right of publicity is more akin to a property right, the breach of which is measured by resulting pecuniary loss, than a personal right whose violation results in emotional injury. *See Toffoloni v. LFP Publ'g Group, LLC*, 572 F.3d 1201, 1205 (11th Cir. 2009) (right of publicity is "characterized by an economic concern that individuals be allowed to control the use of their image in order to maximize the profit they can receive from its publication"); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 967 (10th Cir. 1996) ("right of publicity involves a cognizable property interest"); *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 730 (8th Cir. 1995) ("[T]he right of publicity differs substantially from the right to privacy . . . . The right to publicity protects pecuniary, not emotional, interests."); *Carson,* 698 F.2d at 838 ("[T]he right of publicity vindicates the economic interests of celebrities, enabling those whose achievements have imbued their identities with pecuniary value to profit

from their fame.") (citations omitted); J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 1:7 (2d ed. 2013) (right of publicity is a property right whose origin is in unfair competition, intellectual property and tort law.).

**¶16**　　　　On the other hand, the exception afforded by § 14-3110 to claims for invasion of privacy from the general rule of survival is consistent with the principle that, as a personal action, a claim for invasion of privacy may be asserted only by the individual whose privacy has been infringed.  As the Restatement (Second) of Torts states,

> The right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded.  The cause of action is not assignable, and it cannot be maintained by other persons such as members of the individual's family, unless their own privacy is invaded along with his.

Restatement (Second) of Torts § 652 cmt. a (1977).

**¶17**　　　　But even when appropriation, or violation of the right of publicity, was treated as a variety of invasion of privacy, the Restatement (Second) of Torts expressly allowed such a claim to survive the death of the holder.  *See* Restatement (Second) of Torts § 652(I) cmt. a ("The only exception to this rule [that a claim does not survive the holder's death] involves the appropriation to the defendant's own use of another's name or likeness.").

**¶18**　　　　Accordingly, we conclude § 14-3110 does not except from the general rule of survival a cause of action for violation of an individual's right of publicity.  For that reason, a claim arising from Robin's original online commentary, published while Lois was living, may survive her mother's death.

**¶19**　　　　The estate also asserts that Robin's Mother's Day post, which was published after Lois's death, violated her right of publicity.  Robin contends the right of publicity is not descendible, so that the estate may not assert a claim that arose after Lois's death.

**¶20**　　　　As a property right, however, the right of publicity is "freely assignable," and an assignment "transfers ownership to the assignee, who has standing to assert the right against others."  Restatement Third § 46 cmt. g; *see Bi-Rite Enters., Inc. v. Bruce Miner Co., Inc.*, 757 F.2d 440, 442 (1st Cir. 1985) ("As a commercial, rather than a personal right, [the right of

publicity] is fully assignable."). Consistent with that principle, we hold the right of publicity is descendible, and therefore may be enforced by a decedent's estate. Restatement Third § 46 cmt. h (majority of jurisdictions hold right of publicity is descendible, although "scope of permissible use by others may be greater in the case of post mortem publicity rights"). *See, e.g., Hebrew Univ. of Jerusalem v. General Motors LLC*, 878 F. Supp. 2d 1021, 1031 (C.D. Cal. 2012); *Martin Luther King, Jr., Ctr. for Soc. Change, Inc. v. Am. Heritage Products, Inc.*, 296 S.E.2d 697, 705 (Ga. 1982); *Elvis Presley Int'l Mem'l Found.*, 733 S.W.2d at 97-98 (listing cases).

**¶21** Robin argues a postmortem right of publicity should exist only if the decedent exploited such a right during his or her lifetime. The Restatement rule is to the contrary. Restatement Third § 46 cmt. h ("Although commercial exploitation prior to death can be relevant in establishing the value of the appropriated identity, it should not be required as a condition of descent."); *see* J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 9:17 ("The overwhelming majority rule under either statute or common law is that the right of publicity is descendible property and has a postmortem duration which is not conditioned on lifetime exploitation.").[3]

**¶22** For these reasons, we hold an estate's right to assert the decedent's right of publicity is not conditioned on exploitation of the right during the decedent's life.

## C. The Commentaries Do Not Violate the Estate's Right of Publicity.

**¶23** Finally**,** Robin argues that even if the right of publicity is descendible, the estate has no valid claim because her commentaries were expressive works squarely exempted from liability under the Restatement Third § 47.

---

[3] Although some courts condition the descendibility of the right of publicity on exploitation of the right during the decedent's life, *see, e.g., Sinkler v. Goldsmith*, 623 F. Supp. 727, 733-34 (D. Ariz. 1985); *Hicks v. Casablanca Records*, 464 F. Supp. 426, 429 (S.D.N.Y. 1978); *Nature's Way Products, Inc. v. Nature-Pharma, Inc.*, 736 F. Supp. 245, 252 (D. Utah 1990); *Lugosi v. Universal Pictures*, 603 P.2d 425, 431 (Cal. 1979); those cases lack analysis of that issue and are not persuasive. *See* 2 J. Thomas McCarthy, *The Rights of Publicity and Privacy* § 9:14 ("it seems apparent that the 'lifetime exploitation' requirement appeared out of nowhere in the case law and was parroted by courts thereafter").

¶24 The Restatement Third § 46 provides a cause of action against one who appropriates the commercial value of a person's identity "for purposes of trade," meaning, for example, "in advertising the user's goods or services." *Id.* § 47. Under this rule, "use 'for purposes of trade' does not ordinarily include the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses." *Id.* Sylvia and Doug object to Robin's writings because they disclose personal details about their mother. Viewed in that fashion, however, the commentaries are on the order of an unauthorized biography, which plainly may not give rise to a claim for violation of the right of publicity. *See*, *e.g.*, *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994); *Uhlaender*, 316 F. Supp. at 1282; *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768, 768-69 (N.Y. App. Div. 1980) (sensationalized biographical account of the life of Marilyn Monroe); *see also Montgomery v. Montgomery*, 60 S.W.3d 524, 526, 528 (Ky. 2001) (son's use of deceased father's image in music video not actionable).

¶25 The estate further argues that because Robin published her commentaries for a financial benefit, they constitute the unauthorized use of Lois's name or likeness for commercial purposes. We conclude otherwise. The Restatement Third § 47 makes clear that the mere sale of an expressive work that uses one's likeness or name does not constitute use of the other's identity "for purposes of trade" as required to give rise to a claim for relief. *Id.* at cmt. c ("The fact that the publisher or other user seeks or is successful in obtaining a commercial advantage from an otherwise permitted use of another's identity does not render the appropriation actionable."). Indeed, all of the activities excepted from the definition of "for purposes of trade" are conducted, at least in part, for financial gain: News reporting, entertainment and works of fiction or nonfiction. *Id.*; *see also Ann-Margret v. High Soc'y Magazine, Inc.*, 498 F. Supp. 401, 406 (S.D.N.Y. 1980) (use of plaintiff's image in a magazine article "published and sold for profit" was not actionable); *Rosemont Enters., Inc. v. Random House, Inc.*, 294 N.Y.S.2d 122, 128-29 (N.Y. Sup. Ct. 1968) (use of Agatha Christie's name and likeness in fictionalized biography did not violate right of publicity even though publisher sought to profit from book sales).[4]

---

[4] The estate argues Robin published her on-line commentaries on a website generally devoted to promoting a book Robin had written about her dog. The commentaries, however, contained Robin's personal

## CONCLUSION

¶26    We hold that Arizona recognizes a right of publicity.  The right is descendible, and a claim for violation of the right survives the death of the holder.  It is not limited to celebrities and it need not be exploited during life to be asserted in death.  We affirm the superior court's ruling, however; as a matter of law, Robin's commentaries do not give rise to a claim for relief because they are expressive works that do not employ Lois's name or likeness for purposes of trade.  *See Hale v. Amphitheater Sch. Dist. No. 10,* 192 Ariz. 111, 114, ¶ 5, 961 P.2d 1059, 1062 (App. 1998) (court of appeals may affirm superior court's ruling if correct for any reason).



**Ruth A. Willingham** · **Clerk of the Court**
F I L E D : gsh

---

reflections about her mother and thoughts about aging; neither concerned the book about her dog.