IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

HAROLD GRIES, a single man; GRIES FAMILY LIMITED
PARTNERSHIP, an Arizona limited partnership;
and HAROLD E. GRIES TRUST DATED MARCH 4, 2012,
*Plaintiffs/Appellants/Cross-Appellees*,

*v.*

PLAZA DEL RIO MANAGEMENT CORPORATION, an Arizona
corporation; SHARON HARPER AND OLIVER HARPER, wife and
husband; HARPER FAMILY LIMITED PARTNERSHIP, an Arizona
limited partnership; and OLIVER J. HARPER AND SHARON J. HARPER
AS CO-TRUSTEES OF THE HARPER FAMILY REVOCABLE TRUST
DATED NOVEMBER 15, 1998,
*Defendants/Appellees/Cross-Appellants*.

No. 1 CA-CV 13-0091
FILED 9-9-14

Appeal from the Superior Court in Maricopa County
No.  CV2011-007462
The Honorable Mark H. Brain, Judge

**AFFIRMED**

COUNSEL

Tiffany & Bosco, PA, Phoenix
By Robert A. Royal, Aaron T. Lloyd

Jones Skelton & Hochuli, PLC, Phoenix
By Eileen Dennis GilBride
*Counsel for Plaintiffs/Appellants/Cross-Appellees*

Aiken Schenk Hawkins & Ricciardi, PC, Phoenix
By Shawn K. Aiken, Joseph A. Schenk

Law Offices of Thomas A. Zlaket, PLLC, Tucson
By Thomas A. Zlaket
*Counsel for Defendants/Appellees/Cross-Appellants*

---

**OPINION**

Judge Randall M. Howe delivered the opinion of the Court, in which Presiding Judge Samuel A. Thumma and Judge John C. Gemmill joined.

---

**H O W E**, Judge:

¶1 Harold Gries appeals and Sharon Harper cross-appeals various provisions of the superior court's dismissal of Gries's amended complaint against Plaza del Rio Management Corporation (PDR). Among other issues, the parties contest whether the statutory dissolution of a closely held corporation may be halted when the superior court finds it equitable to do so. We hold that it may and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 In November 1984, Gries and Harper formed PDR—a closely held real estate management and development company. In July 1985, they executed a shareholder's agreement that provided that Harper-controlled and Gries-controlled entities owned PDR equally. The shareholder's agreement also included a buy-sell provision ("Shotgun Provision"), which stated in pertinent part:

> [N]o Stockholder shall transfer or encumber his stock in [PDR] without first obtaining the written consent of [PDR] and all of the then existing Stockholders. Notwithstanding the foregoing, the shareholders of either group acting collectively may submit a written offer to the shareholders of the other group acting collectively of a price at which they are willing to sell their shares or purchase the shares of the shareholders of the other group.

¶3 Until Gries retired in 2000, Harper and Gries were PDR's sole officers, directors, and employees. On June 30, 2000, Harper and Gries met

2

to establish the terms of Gries's retirement ("Retirement Agreement"). The Retirement Agreement provided that Harper would manage PDR, receive a $200,000 base salary, and receive 90% of net profits. The Retirement Agreement also provided that Gries, as a retiree, would receive 10% of net profits. The Retirement Agreement's terms were memorialized in minutes signed by both Gries and Harper, in their capacities as President and Secretary, respectively.

¶4        In August 2011, Gries sued PDR. In his complaint, Gries (1) sought a declaratory judgment that the Retirement Agreement was a shareholder's agreement pursuant to Arizona Revised Statutes ("A.R.S.") section 10–732 and therefore had expired as of June 30, 2010 (Count 1); (2) alleged that Harper breached fiduciary duties and breached statutory standards of conduct pursuant to A.R.S. §§ 10–830 and –842 by paying herself pursuant to the expired shareholder's agreement (Count 2); and (3) requested judicial dissolution of PDR because PDR shareholders and directors were deadlocked and Harper controlled the company and acted oppressively or fraudulently (Count 3). Gries also sought compensatory damages, claiming that because the Retirement Agreement was a shareholder's agreement that had expired, Harper had received salary and profits to which she was not entitled. In response, Harper moved pursuant to A.R.S. § 10-1434 to purchase Gries's PDR shares in lieu of dissolution.

¶5        Gries moved for summary judgment on Count 1, asking the court to find that the Retirement Agreement was a shareholder's agreement. Harper opposed Gries's motion, arguing that the Retirement Agreement was not a shareholder's agreement but instead a "valid employment agreement" that had never expired. Harper moved to stay the proceedings to valuate Gries's PDR shares so that she could purchase his shares in lieu of dissolving PDR. Granting a stay, the superior court ordered the parties to submit two fair market valuations of Gries's PDR shares as of August 2, 2011—one assuming that the Retirement Agreement was a valid shareholder's agreement, and the second assuming that it was not.

¶6        At the fair market valuation hearing, Harper's expert testified that Gries's PDR shares were worth $157,000 if the Retirement Agreement was a valid shareholder's agreement and $117,600 if it was not. Gries's expert testified that Gries's PDR shares were worth $668,000 under a valid Retirement Agreement and $3,066,000 under an invalid Retirement Agreement. Gries also claimed $468,484 in damages.

¶7        After the valuation hearing, the superior court determined that the Retirement Agreement was a shareholder's agreement that had

expired on June 30, 2010 (ten years after the agreement was formed). The court valued Gries's PDR stock at $157,100 and his damages claim at $200,000, totaling $357,100. Although the court had granted Harper's motion to stay Gries's lawsuit, it denied Harper's motion to dismiss Gries's claim for $468,484 in damages, finding that "the net amount [PDR] would likely recover against Harper on this claim is $400,000, half of which would be allocable to Gries'[s] 50% share of [PDR]."

¶8　　　　After the superior court made these rulings, Gries offered to purchase Harper's PDR stock for $157,100 under the Shotgun Provision. Claiming that Harper had accepted his offer, Gries attempted to oust Harper as PDR's president by holding his own board of directors meeting. Harper then moved for a temporary restraining order against Gries. The superior court granted Harper's motion and held a hearing where the parties agreed that Harper's motion would be treated as a request for injunctive relief. The court dismissed Gries's "recent 'offer' to buy [Harper's] shares" for $157,100, finding that although either party could invoke the Shotgun Provision, the parties could not use the court's valuation of the PDR shares as the sales price.

¶9　　　　Gries moved for reconsideration of the court's share value ruling, arguing that the court's valuation contained "factual/mathematical errors." Before the court ruled on the motion, Gries offered to purchase Harper's PDR shares for $1.5 million pursuant to the Shotgun Provision. Harper asked the court to declare that Gries could not invoke the Shotgun Provision. She argued that Gries had surrendered his contractual remedies to resolve their business dispute by seeking judicial dissolution of PDR; once that procedure had begun, A.R.S. § 10–1434(E) bound the court to direct Gries to sell his stock to Harper at the court's determined value. Gries responded that he had not surrendered his contractual rights because under A.R.S. § 10–732(A), the rights and obligations set forth in a shareholder's agreement take precedence over Arizona's corporation statutes.

¶10　　　　At the hearing on the matter, Harper argued that allowing Gries to invoke the Shotgun Provision would be inequitable because her emotional attachment to PDR would force her to buy Gries's shares at a price much higher than the court's determination of the shares' value. The court responded that it could not recognize Harper's emotional attachment to the corporate form of PDR and noted that Harper was free under the Shotgun Provision to sell her PDR shares to Gries for the same amount that he had offered to sell to her. The court found that allowing the exercise of the Shotgun Provision in lieu of the dissolution proceedings was equitable because Gries and Harper were better able than the court to determine the

4

shares' value, and Harper had the right under the provision to sell her shares to Gries if she so chose.

¶11        Harper then elected to purchase Gries's PDR shares for $1.5 million. Harper also moved to dismiss Gries's amended complaint as moot because Harper would purchase Gries's PDR shares pursuant to the Shotgun Provision. Gries argued that dismissal was improper because his request for attorneys' fees and motion for reconsideration had not been ruled upon. The court nevertheless dismissed Gries's amended complaint with prejudice "on the grounds that the claims asserted therein are now moot," vacated all interlocutory rulings, and awarded Harper $459 in costs.

¶12        The court denied Gries's motion for reconsideration of the share valuation ruling. The court further held that Gries was not entitled to overpayments made to Harper after the Retirement Agreement expired as a shareholder's agreement because "[s]uch a claim was owned by the company (and by extension, its shareholders), and the right to what amounts to 'withheld dividends' passed to Harper when she purchased the shares for the price set by Gries."

¶13        Gries timely appealed the dismissal of his claim for damages. Harper timely cross-appealed (1) the order declaring the Retirement Agreement a shareholder's agreement; (2) the order denying Harper's motion for declaratory relief and granting Gries's "Cross-Motion for Declaratory Relief;" and (3) "the [superior] court's refusal to award [Harper] reasonable attorney's fees under A.R.S. § 12–341.01."

## DISCUSSION

### I.        Motion to Dismiss Gries's Appeal as Moot

¶14        Harper argues that Gries's appeal should be dismissed as moot because "[Gries has] voluntarily accepted the benefit of the [j]udgment from which [he] ha[s] appealed." We reject Harper's argument because Gries is an aggrieved party who has the right to appeal. Arizona Rule of Civil Appellate Procedure 1 provides that "[a]n appeal may be taken by any party aggrieved by the judgment." A party is aggrieved if the judgment has denied the party a personal or property right. *In re Strobel*, 149 Ariz. 213, 216, 717 P.2d 892, 895 (1986). The judgment here dismissed Gries's amended complaint for damages, an action Gries opposed. Because the judgment, if incorrect, deprived Gries of a property right to seek damages, Gries is aggrieved under Rule 1. Gries's success at executing the Shotgun Provision and selling his shares in PDR to Harper is irrelevant to the judgment and does not prevent him from being an aggrieved party.

## II.     A.R.S. § 10–1434 Dissolution Proceeding

**¶15**         Harper argues that the superior court erred in finding that discontinuing the dissolution proceedings under A.R.S. § 10–1434 was equitable because the parties had exercised the Shotgun Provision, making the dissolution proceeding unnecessary. We review a grant of equitable relief for an abuse of discretion. *See Flying Diamond Airpark, LLC v. Meienberg*, 215 Ariz. 44, 50 ¶ 27, 156 P.3d 1149, 1155 (App. 2007). A discretionary decision involves assessing "conflicting procedural, factual or equitable considerations which vary from case to case and which can be better determined or resolved by the trial judge." *City of Phoenix v. Geyler*, 144 Ariz. 323, 329, 697 P.2d 1073, 1079 (1985) (quoting *State v. Chapple*, 135 Ariz. 281, 297 n.18, 660 P.2d 1208, 1224 n.18 (1983), *superseded in part by statute*, A.R.S. § 13–756, *as recognized in State v. Benson*, 232 Ariz. 452, 467 ¶ 66, 307 P.3d 19, 34 (2013)). We defer because a trial court "has a more immediate grasp of all the facts of the case, an opportunity to see the parties, lawyers and witnesses, and . . . can better assess the impact of what occurs" in court. *Id.* Only when the facts and the inferences from those facts are undisputed and the resolution of the issue "is one of law or logic" may we substitute our judgment for the trial court's. *Id.*

**¶16**         A shareholder may petition to dissolve a corporation if the corporation's directors are deadlocked in the management of corporate affairs and the corporation cannot conduct its business and affairs. A.R.S. § 10–1430(B)(1). In a dissolution proceeding, "one or more shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares" if the corporation has no shares listed on a national securities exchange "or regularly traded in a market maintained by one or more members of a national or affiliated securities association." A.R.S. § 10–1434(A). An election to purchase the corporation's shares "is irrevocable unless the court determines that it is equitable to set aside or modify the election." *Id.* Once the election is filed and the corporation has sent out proper notice, the dissolution proceeding "shall not be discontinued or settled[] . . . unless the court determines that it would be equitable to the corporation and the shareholders other than the petitioner to permit this discontinuance, settlement, sale or other disposition." A.R.S. § 10–1434(B).

**¶17**         The shareholders have sixty days from the date of the election to agree on the fair value and terms of purchase of the shares. A.R.S. § 10–1434(C). If they cannot agree, the court determines the fair value of the shares as of the day before the day that the dissolution petition was filed. A.R.S. § 10–1434(D). Once the court has determined the value of the shares,

the court directs the purchase of the shares "on the terms and conditions as the court deems appropriate," A.R.S. § 10–1434(E), and dismisses the petition for dissolution, A.R.S. § 10–1434(F).

¶18    Gries began dissolution proceedings of PDR under A.R.S. § 10–1430 claiming director deadlock. Harper then elected to purchase Gries's PDR shares in lieu of dissolution under A.R.S. § 10–1434(A). Because Harper and Gries could not agree on the value of Gries's shares, the court held a hearing and determined their fair value. At that point, however, Gries opted to exercise the Shotgun Provision to resolve their dispute: either Gries would buy Harper's share in PDR for $1.5 million, or allow Harper to buy his shares for $1.5 million. The court then stopped the dissolution proceeding, finding that the exercise of the Shotgun Provision equitably resolved the dispute. The court had the statutory authority to do so. Section 10-1434(B) provides that once a shareholder has elected to purchase a corporation's shares in lieu of dissolution, the dissolution proceedings cannot be "discontinued or settled" unless the superior court "determines that it would be equitable to the corporation and the shareholders."

¶19    Harper contends, however, that the superior court had no authority to do so. She argues that the court was required to order Gries to sell his shares to Harper under A.R.S. § 10–1434(E) once it determined the shares' fair value because the statute says so: "On determining the fair value of the shares, the court *shall* enter an order directing the purchase . . . [of the shares]." (Emphasis added.) She believes that the word "shall" removes any discretion the court may have had earlier in the proceedings.

¶20    Although "shall" may be used in a statute in a mandatory sense, it may also be used in a "directory"—permissive—sense if it comports with the statute's purpose. *Ariz. Downs v. Ariz. Horsemen's Found.*, 130 Ariz. 550, 554–55, 637 P.2d 1053, 1057–58 (1981); *HCZ Const., Inc. v. First Franklin Fin. Corp.*, 199 Ariz. 361, 364 ¶ 11, 18 P.3d 155, 158 (App. 2001). "Shall" in the context of A.R.S. § 10–1434(E) does not mandate the share purchase; it merely establishes the order of events. Once the court has determined the shares' value, the next step is ordering the purchase "on the terms and conditions as the court deems appropriate." A.R.S. § 10–1434(E). Reading "shall" as mandatory would eliminate the court's discretion under A.R.S. § 10–1434(B) to provide for a different resolution of the proceedings if that "would be equitable to the corporation and the shareholders." Such a reading contradicts the statutory construction rule that related statutes must be "read together and harmonized[] to avoid rendering any clause, sentence or word 'superfluous, void, contradictory or insignificant.'" *State v. Cid*, 181 Ariz. 496, 499–500, 892 P.2d 216, 219–220 (App. 1995) (quoting

*State v. Johnson*, 171 Ariz. 39, 42, 827 P.2d 1134, 1137 (App. 1992)) (citations omitted). Moreover, determining the fair value of shares does not preclude the court from halting proceedings in an election to purchase in lieu of dissolution under A.R.S. § 10–1434(A) if doing so is equitable to the shareholders or the corporation.

¶21 The court acted within its discretion in finding that stopping the dissolution proceedings and allowing the exercise of the Shotgun Provision was equitable. Allowing Gries and Harper to exercise the provision respected their freedom of contract—to provide by private contract a method of resolving their business disputes. Freedom to contract "has long been considered a valuable right." *Consumers Intern., Inc. v. Sysco Corp.*, 191 Ariz. 32, 34, 951 P.2d 897, 899 (App. 1997) ("[I]f there is one thing which more than another public policy requires it is that [people] of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice.") (quoting *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (1951)). "Our law generally presumes, especially in commercial contexts, that private parties are best able to determine if particular contractual terms serve their interests." *1800 Ocotillo, LLC v. WLB Group, Inc.*, 219 Ariz. 200, 202 ¶ 8, 196 P.3d 222, 224 (2008). Consistent with that principle, A.R.S. § 10–732(A) recognizes that shareholders may arrange their rights and obligations between each other and their corporation as they see fit, even if the arrangements differ from the provisions of Arizona's corporation statutes: "An agreement among the shareholders of a corporation that complies with this section is effective among the shareholders and the corporation even though it is inconsistent with one or more other provisions of chapters 1 through 17 of this title if it meets . . . [certain conditions]." Allowing the exercise of the Shotgun Provision honored Gries and Harper's agreement.

¶22 Moreover, as the superior court recognized, exercising the Shotgun Provision fairly resolved Gries and Harper's business dispute. A shotgun provision in a shareholder's agreement allows one party to set the purchasing price of other party's shares, and the other party the option of buying or selling the shares at that price. If the first party sets the share price below its fair value, that party risks the other party buying the shares too cheaply. If the first party sets the price above fair value, that party risks the other party selling the shares at an inflated price. To avoid selling too cheaply or buying too dearly, the first party will set a price at the fair value and will receive or give fair value, depending on the other party's decision to buy or sell. The other party, likewise, will buy or sell at the fair value, as the party deems appropriate. In this way, the shareholders of a company

guarantee that any business dispute they may have will result in a financially fair resolution.

¶23        The Shotgun Provision here operated as Gries and Harper had intended. Gries was in a better position than the court to assess the value of PDR's shares and offered to buy Harper's shares for $1.5 million. Pursuant to the Shotgun Provision, Harper had the choice of accepting Gries's offer or buying Gries's shares herself. This resulted in a financially fair outcome because Harper's power to choose to sell her shares to Gries or to buy Gries's shares at the price Gries initially set required Gries to set a fair price. The Shotgun Provision ensured a fair resolution to their business dispute.

¶24        Harper nevertheless argues that allowing Gries to exercise the Shotgun Provision was inequitable because her need to preserve her noneconomic interest in PDR forced her to buy his shares. Although Harper may have had personal motivations to buy Gries's shares to maintain control and involvement over PDR, such motivations do not constitute improper coercion. *See Reichenberger v. Salt River Project*, 50 Ariz. 144, 156, 70 P.2d 452, 457 (1937) ("The reasons which induce parties to enter into a contract are generally immaterial as a matter of law. If there be a legal consideration for the contract, then the question for the court is not 'why did the parties make the contract,' but 'what contract did they make.'"). Harper freely chose to enter into a shareholder's agreement that contained the Shotgun Provision—which she knew would require her to choose between selling her shares to Gries or buying Gries's shares if a dispute arose. Pursuant to the Shotgun Provision, Harper freely chose to buy Gries's shares. The motivations behind her choice are irrelevant. Because Harper's choice was voluntary, holding her to her contractual obligation to buy Gries's shares—which in return gave her complete ownership and control of the company—was equitable. The court thus did not abuse its discretion in allowing the exercise of the Shotgun Provision and dismissing the dissolution action.

### III.    The Dismissal of Gries's Amended Complaint for Damages

¶25        Gries argues that the superior court erred in dismissing his claim for damages despite its finding that the Retirement Agreement was a shareholder's agreement. The basis of Gries's claim is that Harper improperly continued to pay herself pursuant to the Retirement Agreement when it had expired as a shareholder's agreement after ten years. *See* A.R.S. § 10–732(B)(3). Harper, however, argues that Gries had no claim for damages because the Retirement Agreement was not a shareholder's

agreement and thus did not expire after ten years. Harper contends that the Retirement Agreement does not satisfy the statutory requirements of a shareholder's agreement set forth in A.R.S. § 10-732(B) because (1) the minutes from that meeting do not contain the signatures of the Gries Family Limited Partnership and the Harper Family Limited Partnership; (2) the Retirement Agreement was created during the director's portion of that meeting and not during the shareholder's portion; and (3) Gries and Harper signed the Retirement Agreement as officers of PDR.

¶26        We review questions of statutory interpretation de novo. *City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, 178 ¶ 5, 181 P.3d 219, 225 (App. 2008). "In construing a statute, we look to the plain language of the statute, giving effect to every word and phrase, and assigning to each word its plain and common meaning." *Ponderosa Fire Dist. v. Coconino Cnty.*, 1 CA-CV 13-0545, 2014 WL 3608597, at *5 ¶ 24 (Ariz. App. July 2014). If the language is clear and unambiguous, we apply it without considering other methods of statutory interpretation. *Id.*

¶27        Section 10–732 governs the formation of a shareholder's agreement. Subsection A identifies the possible subjects that a shareholder may determine or regulate in shareholder agreements, including "establish[ing] the terms and conditions of employment of shareholders." A.R.S. § 10–732(A)(8). Subsection B identifies the requirements of a valid shareholder's agreement. The agreement must be set forth in either (1) "the articles of incorporation or bylaws and approved by all persons who are shareholders at the time of the agreement," A.R.S. § 10–732(B)(1)(a), or (2) "a written agreement that is signed by all persons who are shareholders at the time of the agreement that is filed with the corporation," A.R.S. § 10–732(B)(1)(b). If these requirements are met, the agreement is valid for ten years, unless the agreement provides otherwise.  A.R.S. § 10–732(B)(3).

¶28        The Retirement Agreement did not satisfy A.R.S. § 10–732(B)'s requirements. Although the Retirement Agreement falls within the scope of A.R.S. § 10–732(A)(8) by establishing the terms and conditions of Gries's and Harper's employment, it falls short of A.R.S. § 10–732(B)(1)'s requirement that the agreement be signed by "all persons who are shareholders" in two ways. First, the Retirement Agreement was signed only by Gries and Harper in their corporate capacities as PDR's Chairman and Secretary—not as shareholders. Second, unlike the 1985 shareholder's agreement, the Retirement Agreement did not contain the signatures of the Harper Family Limited Partnership and the Gries Family Partnership, which each owned fifty shares of PDR stock. Because the Retirement Agreement was not "signed by all persons who are shareholders," the

Retirement Agreement is not a shareholder's agreement and thus not subject to expiration after ten years. Rather, the Retirement Agreement is a valid employment agreement that established Gries's and Harper's compensation in light of Gries's retirement from PDR. Thus, the trial court did not err in dismissing Gries's amended complaint for damages because his claim was predicated on a finding that the Retirement Agreement had expired after ten years, which it did not. *In re Estate of Reynolds*, 235 Ariz. 80, 85 ¶ 26, 327 P.3d 213, 218 (App. 2014) (stating that an appellate court will affirm the trial court's ruling if correct for any reason).

### IV. Attorneys' Fees At Trial

**¶29**     We next consider Harper's argument that the superior court failed to award her attorneys' fees under A.R.S. § 12–349, which provides for an award of attorneys' fees as a sanction for an unjustified action. *Café Valley, Inc. v. Navidi*, 235 Ariz. 252, 256 ¶ 15, ___ P.3d___, ___ (App. 2014). The record is devoid of evidence that Gries's claim was unjustified. We therefore affirm the superior court's decision to not award Harper attorneys' fees.

### V. Attorneys' Fees On Appeal

**¶30**     Both parties request an award of attorneys' fees on appeal pursuant to A.R.S. § 12–341.01(A). In our discretion, we deny both requests for attorneys' fees.

### CONCLUSION

**¶31**     For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: JT